IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NORMAN AND CAROLYN WEST, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| -vs- ) | Case No. CIV-06-926-F |
| ) | |
| FOREMOST INSURANCE ) | |
| COMPANY, a Michigan corporation, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Before the court is Defendant Foremost Insurance Company's Motion for Summary Judgment, filed on September 18, 2007 (doc. no. 47). Plaintiffs, Norman and Carolyn West, have responded to the motion, and defendant has replied. Upon due consideration of the parties' submissions, the court makes its determination.

Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "'The moving party has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case."'" BancOklahoma Mortg. Corp. v. Capital Title Co., Inc., 194 F.3d 1089, 1097 (10th Cir. 1999) (quoting Bacchus Industr., Inc. v. Arvin Industr., Inc., 939 F.2d 887, 891 (10th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). In response to a properly supported motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of the adverse party's

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" BancOklahoma Mortg. Corp., 194 F.3d at 1098 (quoting Anderson, 477 U.S. at 247-248). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, the court's inquiry is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" BancOklahoma Mortg. Co., 194 F.3d at 1098 (quoting Anderson, 477 U.S. at 251-252). In considering the motion for summary judgment, the court examines all evidence in a light most favorable to the nonmoving party. BancOklahoma Mortg. Co., 194 F.3d at 1098.

Relevant Facts

The relevant facts, viewed in a light most favorable to plaintiffs, are as follows. While plaintiffs were out of town over the labor day weekend in 2005, a water line to the ice-maker in their refrigerator failed. When they returned home on September 5, 2005, plaintiffs found the main floor of the home as well as the partial basement flooded. At the time, plaintiffs were insured by a Foremost Specialty Dwelling Policy, Policy No. 381-0065434443, which provided coverage for plaintiffs' home and personal property.

Upon discovery of the water, plaintiffs hired Thomas Orr, a handyman that plaintiffs had used in the past, to repair the failed water line, extract water, remove contents, and dry all flooring.

Plaintiffs reported the incident to defendant on September 9, 2005. Randy Murray was assigned by defendant to adjust plaintiffs' loss. Mr. Murray attempted

to contact plaintiffs on September 9, 2005 but was not able to reach plaintiffs until September 12, 2005.

On September 13, 2005, Mr. Murray inspected plaintiffs' home. Mr. Murray reported in his notes that the home appeared "to be dry unless moisture in basement and ceiling." Exhibit 1, defendant's motion, WEST v. FOREMOST0036. Mr. Murray advised plaintiffs that they needed to let ServiceMaster or another restoration company come out to check for moisture and to complete drying. Plaintiffs were not comfortable with the companies recommended. Mr. Murray advised plaintiffs that they could call any vendor but that they needed to call someone. Plaintiffs continued to use Mr. Orr to dry out their home.

On the date of his inspection, Mr. Murray prepared an estimate for repair of the water damage, and after subtracting plaintiffs' deductible and depreciation, issued a field check to plaintiffs in the amount of $4,886.37. Mr. Murray indicated in his report on the claim and notes in regard to the claim that the prices for carpet and pad were to be later determined.

On September 15, 2005, plaintiffs retained Lewis & Associates, public insurance adjusters. On September 29, 2005, claims adjuster Josephine Bryan spoke with Harvey Lewis of Lewis & Associates. He advised that he would provide an estimate to defendant for repair of plaintiffs' home. Ms. Bryan and Mr. Lewis made plans to meet to resolve the claim once all information was submitted.

Plaintiffs retained C&H Construction Co. LLC to prepare an estimate for repairs to their home. On September 20, 2005, Dick Spears of C&H Construction Co. LLC prepared an estimate totaling $26,962.83.

Mr. Lewis provided the estimate submitted by Mr. Spears to Ms. Bryan on October 11, 2005. According to Ms. Bryan's notes, the home had mold due to the fact that the home did not appear to be dried out properly. The estimate was thereafter

reviewed with Loyd Schultz with Steve Breed Construction. An appointment was made with Mr. Spears to discuss the estimate. On the appointment date, Mr. Schultz advised Ms. Bryan that Mr. Spears did not want to meet with them that day because he did not feel that he could defend the estimate that he wrote. According to Ms. Bryan's notes, Mr. Spears apparently wrote the estimate at plaintiffs' instructions.

On October 13, 2005, defendant received a report from Pat Eden Consulting, on behalf of plaintiffs, indicating that plaintiffs' security system, heat and air, appliances and electronics should be replaced due to the amount of water and humidity in the home.

On October 14, 2005, plaintiffs filed a chapter 7 voluntary petition in the United States Bankruptcy Court for the Western District of Oklahoma. The Summary of Schedules listed plaintiffs' personal property in the amount of $29,930.00. Schedule B – Personal Property listed home furnishings in the amount of $400.

On November 11, 2005, defendant provided to plaintiffs an additional estimate for repair to plaintiffs' home. Defendant also issued a payment to plaintiffs of $9,706.41, which represented actual cash value of the repairs less the deductible less the prior payment. Defendant advised that plaintiffs could collect up to the recoverable depreciation if repairs were completed within 180 days of the loss.

On December 19, 2005, Wayne Schwartz of W.S. Estimate Service provided an addendum to the C&H Construction Co. LLC repair estimate. The addendum included a repair estimate for the security system, electrical wiring and the HVAC system. The submitted bids were as follows: security system ($20,749.25), electrical wiring ($2,702), and HVAC system ($11,200). The addendum also included a bid for removal and replacement of the subfloor in the kitchen in the amount of $ 243.44 and removal and replacement of drywall in the kitchen in the amount of $130.68. The addendum totaled $42,130.31, which figure included 10% for profit and 10% for

overhead. The total repair estimate for the home submitted on behalf of plaintiffs was $69,093.14.

On December 20, 2005, defendant took a recorded statement of plaintiff, Norman West, regarding the water loss. Defendant questioned plaintiff as follows:

Q. Okay. But you do plan on filing bankruptcy this year and . . .

A. Yes sir I do.

* * * *

Q. Okay. But you haven't filed anything yet?

A. I'm getting ready to very quickly.

Q. Okay.

* * * *

A. We're we're gettin' ready to.

Q. Okay.

A. It's not finalized yet, but we're thinkin' about it very seriously.

Exhibit 16, defendant's motion, p. 2.

On January 11, 2006, plaintiff, Norman West, was examined under oath by defendant. Plaintiff testified that he was disabled and received monthly disability payments in the amount of $3,378.99. He also testified that his other source of income was from his grandmother who gave him money every year. The largest gift she had given was $25,000. Exhibit 3, defendant's motion, p. 27, ll. 16-25.

In his examination, plaintiff was also questioned regarding the recorded statement he gave on December 20, 2005 regarding his bankruptcy filing. Plaintiff testified as follows:

Q. At the time you gave the recorded statement in December 2005, you said you had not filed bankruptcy. Do you recall that?

   A. No. I believe I had said we were in the process of filing that, but it was not finalized. Even to this day it's not finalized. It's not been discharged is what I meant to say. If that was a misunderstanding, I meant we had filed, but it's not discharged as of that time or this time. I kind of was -- I didn't quite understand what the question was at the time, but I see now that it was like I just mentioned.

   * * * *

   Q. We talked earlier about your bankruptcy and in your recorded statement you were asked if you had ever filed bankruptcy and you said, "I am going to file bankruptcy this year. I am going to file."

   A. Yes, but it's not going to be discharged, the lawyer told me, for several months.

   Q. The question was asked, "But you haven't filed anything yet?" You said, "I am getting ready to very quickly. We are getting ready to."

   A. We had turned in some papers to the attorney and at that time we had not turned everything in, so there was paperwork that needed to be brought in before we could finalize going forward.

   * * * *

   Q. At that time nothing had been filed with the bankruptcy court?

   A. I don't know. We had turned stuff in to the lawyer so we knew we were going to file bankruptcy sometime in the next quarter. We had turned paperwork in to the lawyer around October, but we didn't have everything in to him until, gosh, probably last week, as far as last week we still hadn't got all the information in; but we had turned the paperwork in to the lawyer and whatever he filed, I don't know what dates he filed.

   Q. You told me earlier it was filed in October.

   A. Yes, October 14, I believe was the time we filed.

  Q. This statement was December 20, 2005?

  A. Yes, and we still at that time did not have everything in to the lawyer.

  Q. It says you planned on -- "Do you plan on filing bankruptcy this year?" and you said, "Yes"?

  A. Yes. We had turned paperwork in to the attorney, but in my mind, I thought things were discharged more quickly, but I have since found out when you turn paperwork in and you fill out the papers, you have started the filing procedure; but it's not actually done and finished, in my mind, until it's discharged and the lawyers said discharges take two to three months.

Exhibit 1 to plaintiffs' response, p. 37, ll. 4-16, p. 104, ll. 18-25, p. 105, ll. 1-9, ll. 14-25, p. 106, ll. 1-18.

  In the examination under oath, plaintiff, Norman West, also testified that the security system consisted of a burglar alarm system and a camera system. Plaintiff testified that he paid $3,800 for the burglar alarm and traded a dirt bike and several ounces of gold for the camera system. Exhibit 3, defendant's motion, p. 86, ll. 1-8.

  On January 17, 2006, LV Systems, Inc. submitted a bid at the request of Steve Breed Construction, on behalf of defendant, for replacement of plaintiffs' security system. The bid totaled $2,995.77.

  On January 20, 2006, Steve Breed Construction also received a bid from Action Aire Company of Oklahoma City to clean and service plaintiffs' furnace and to replace duct systems in the amount of $2,204.44.

  On March 27, 2006, defendant issued a check for repairs to plaintiffs' dwelling in the amount of $12,467.00, which represented actual cash value for the repairs, less the deductible, depreciation and prior payment. With this payment and the prior payments, defendant had paid plaintiffs $27,059.78 for the repair of their home.

Plaintiffs submitted an inventory list for personal property which totaled in excess of the policy limits of $71,110.00. One of the items for which plaintiffs sought replacement was a 25-amp redox machine, used by plaintiff, Norman West, to refine precious metals, such as gold. Plaintiffs claimed $26,995 for replacement of the machine. Defendant determined that the $2,500 limit on business equipment applied to the machine.

In his examination under oath, plaintiff, Norman West, testified as follows in regard to the use of the redox machine.

Q. . . . What do you do with the metals you get?

A. Sell them. Refineries buy them, people buy them. Once you have gold in metallic form, you can sell it to jewelry stores. It's a hobby in my case. I have done it more for a hobby than a business. It goes along with my metal detecting. I like to metal detect.

* * * *

Q. How often do you use that machine to do refining.

A. I have used it less than a dozen times. No more than a dozen times.

Q. Since you bought it?

A. Yes.

* * * *

Q. When did you buy it?

A. I think in 2002, 2001 . . . .

* * * *

Q. What are examples of some jewelry stores or pawn shops or anything like that that you have sold some of this stuff to?

A. Never any pawn shops. They beat you up. Jewelry stores are better. Best place I have found is on the Internet. I have sold material on the Internet.

Exhibit 1 to plaintiffs' response, p. 66, ll. 12-19; p. 68, ll. 23-25; Exhibit 3 to defendant's motion, p. 67, ll. 22-23; p. 69, ll. 1-3, 19-25.

In the examination under oath, plaintiff, Norman West, also testified in regard to a company called West Star Industries as follows:

Q. Looks like you took your computer into Advantec Solutions?

A. Yes.

Q. They billed it to West Star Industries, what is that?

A. I would like to, in the future, have my own shop where you have rocks and polish them and tumble them, sell gold and precious metals. That's the company I would like to call it West Star Industries if I have a shop.

Q. West Star Industries does not exist?

A. No, well, it's a name I would like to use in the future; but no, it's not a company per se.

Q. Has West Star Industries been incorporated or formed in any sort of legal entity?

A. Yes, it has. We have got a sub "S" corporation. I have not used it. I hope to use it in the future.

Q. That's been registered with the Secretary of State in Oklahoma?

A. Yes.

Exhibit 3, defendant's motion, p. 70, ll. 11-25, p. 71, ll. 1-8.

Plaintiff also testified in regard to a credit card machine as follows:

Q. Credit card machine should not be on here. It's okay.

A. What do you that machine for?

Q. I haven't. Like I said, I wanted to have it when I went into business for myself and got my rock shop, precious metal shop I wanted one before they went up in [price].

> Q. You bought that four years ago and you have never used it?
>
> A. Correct.

Exhibit 3, defendant's motion, p. 82, ll. 6-15.

Another personal property item claimed by plaintiffs was a juke box which had been purchased from Sam's Club. Plaintiffs claimed $10,000 for the juke box. They had obtained the price from Amini's Galleria, which had indicated that it could obtain the juke box for plaintiffs. Plaintiffs later obtained a print out dated January 9, 2006 from Sam's Club which listed the price of a similar juke box as $6,426.00. Plaintiff, Norman West, testified in the examination under oath in regard to the juke box as follows:

> Q. On line 2, it show[s] a cost of replacement $10,000, but I can't tell what that is. Is that for the juke box?
>
> A. Yes.
>
> Q. Is that the juke box that shows $6,426?
>
> A. Yes, and we have a price from Amini's and they said to replace that juke box here that's what their price is. We took our estimate from Amini's because they said they could get one.
>
> Q. The juke box that comes from Amini's is the same one that came from Sam's?
>
> A. They are pretty close. Color may be different.
>
> Q. What I'm asking is would the cost to replace with $10,000 or would it be $6,426 as shown on the Sam's printout dated 1/9/06?
>
> A. Availability, like I say, we got this recently, so I don't know if Sam's can replace it for this cost. If they can, it would be better than getting it from Amini's .
> . . .

Exhibit 3, defendant's motion, p. 100, ll. 5-25.

Other personal property items claimed by plaintiffs included office furniture, which consisted of three desks and a conference table. Two of the desks were listed as "Bush" desks. The furniture was reported to have been purchased at Office Depot. Defendant contacted Office Depot and was told that the price of a comparable Bush product was $139. Plaintiffs submitted replacement cost estimate for office furniture from ABC Enterprises in excess of $16,000.

Defendant ultimately paid $24,639.09 for plaintiffs' personal property. It also paid plaintiffs for additional living expenses in the amount of $4,570.00.

On August 30, 2006, plaintiffs commenced this action against defendant, alleging claims for breach of contract and bad faith. Plaintiffs specifically seek punitive damages for the bad faith claim. In its motion, defendant seeks summary judgment on both of plaintiffs' claims.

Breach of Contract Claim

Defendant contends that plaintiffs cannot recover additional damages to their home and personal property due to their four-day delay in reporting the loss to defendant and their failure to adequately dry the home. Defendant asserts that plaintiffs' insurance policy places an affirmative duty on the insured to promptly notify defendant of any losses and to take the necessary steps to prevent further losses to the property.[1] Defendant contends that plaintiffs refused the services of licensed

---

[1] The policy provisions relied upon by defendant state in pertinent part:

    3.    **What to Do When You Have a Loss**.

\* \* \* \*

When you have a loss, you or someone on your behalf must notify us at once. The quickest way is to phone your insurance representative or us.

\* \* \* \*

11

and approved vendors offered by defendant, even though costs incurred employing such vendors was covered by plaintiffs' insurance policy.[2] Instead of using the approved vendors, defendant asserts that plaintiffs used Mr. Orr, who was a handyman and who plaintiffs admitted was unsuccessful in drying the home. Defendant contends that most of the disputed items of damage to plaintiffs' home and personal property are the result of Mr. Orr's failure to adequately dry the home. This is particularly true, defendant argues, as to the electrical items plaintiffs allege may fail in the future due to high humidity in the home. Defendant asserts that plaintiffs' own experts agree that failure to mitigate caused the additional damage to plaintiffs' home. Because plaintiffs failed to timely report the loss and properly mitigate the damages, defendant contends that it is entitled to judgment on plaintiffs' claim that defendant breached the policy by failing to pay for the additional damage.

In addition, defendant contends that plaintiffs are not entitled to recover under the insurance policy for any damages caused by mold or wet rot. According to defendant, these damages are specifically excluded by the policy, regardless of the

---

> If you have a loss, you must protect your dwelling, other structures or personal property from any further loss. If you fail to do so, any further loss will not be insured by this policy.

Exhibit 2, defendant's motion, p. 18 of policy

[2] The policy provision relied upon by defendant states in pertinent part:

> 2.   **Emergency Repairs After Loss.** We will pay any actual, reasonable and necessary expenses for emergency repairs incurred in protecting your dwelling, other structures and personal property from further damage if the damage was caused by an Insured Peril.

Exhibit 2, defendant's motion , p. 5 of policy.

cause.³ As the policy explicitly excludes damages caused by mold or wet rot, defendant contends that it is entitled to judgment on plaintiffs' claim that defendant breached the policy in failing to pay damages caused by mold or wet rot.

Next, defendant asserts that plaintiff is not entitled to recover damages for replacement of the redox machine. Defendant contends that it properly applied the business property exception which limits recovery for personal property used primarily for business purposes to $2,500. According to defendant, the policy defines "business" as "any full-time or part-time trade, profession or occupation engaged in for economic gain." Defendant contends that the evidence shows that plaintiff, Norman West's use of the redox machine fell within the "business" definition.

Finally, defendant contends that it is entitled to judgment on plaintiffs' breach of contract claim because plaintiffs made misrepresentations and omissions in connection with their claim for benefits. According to defendant, the insurance policy specifically provides that the entire policy will be void if the insured intentionally conceals or misrepresents any material fact or circumstance.⁴ Defendant contends that

---

³ The policy provision relied upon by defendant states in pertinent part:

> We do not under any circumstances insure loss, damage or remediation costs caused by or resulting from the presence of mold, mildew, or other fungi, their secretions, and dry and wet rot of any kind regardless of the cause, condition or loss that led to their formation or growth.

Exhibit 2, defendant's motion, WEST v. FOREMOST OOO6.

⁴ The policy provision relied upon by defendant states in pertinent part:

> 2.   **Concealment or Fraud**. The entire policy will be void if any of you:
>
> a.   Intentionally conceal or misrepresent any material fact or circumstance;
> b.   Engage in fraudulent conduct; or

13

plaintiffs lied to defendant about their bankruptcy filing and claimed recovery for items not damaged by the loss. It also asserts that plaintiffs misrepresented and made omissions in regard to the scope of plaintiffs' loss. In particular, defendant asserts that plaintiffs claimed damages of $100,000 to personal property, yet only claimed to own $29,000 in personal property in their bankruptcy schedule. Defendant also asserts that plaintiffs claimed certain electrical appliances and systems were damaged, yet admitted that many of the items were still working. Defendant additionally assert that plaintiffs submitted claims for replacement of personal property using price estimates for items which were not of like kind and quality to the property they owned. Defendant also contends that plaintiffs submitted a $20,000 estimate to replace their home security system even though they had bought the security system at a flea market for $3,800; submitted a $11,200 estimate to replace their HVAC system and duct work and defendant obtained an estimate for $2,202.44; and submitted an estimate for $10,000 for a juke box but could not produce a receipt and admitted it could be replaced for approximately $6,400. Defendant contends that all of the misrepresentations and omissions made by plaintiffs were material and that these material misrepresentations and omissions preclude plaintiffs from recovering any damages on their breach of contract claim.

Plaintiffs, in response, do not dispute that the insurance policy excludes mold damage. However, plaintiffs contend that the damages are not sought under the contract; rather, they contend that the damages are extra-contractual in nature and are sought through their bad faith claim. According to plaintiffs, defendant's failure to

---

      c.      Make false statements;

whether before or after a loss or claim relating to this insurance.

Exhibit 2, defendant's motion, pg. 18 of policy.

reasonably investigate and timely pay their claim was the cause of the damage from mold and wet rot. Plaintiffs also contend that the additional damage to their home was not caused by their improper drying of the home but due to defendant's failure to authorize payment for removal of their hardwood floors. Plaintiffs contend that they provided a report from their expert on November 25, 2005 which indicated that the floors must be removed to allow proper remediation but defendant ignored it. Plaintiffs contend that defendant breached the contract by intentionally underscoping their damages.

Plaintiffs additionally argue that defendant improperly withheld payment on plaintiff's Redox machine. Plaintiffs contend that defendant knew that the machine was used strictly as a hobby and not as a business.

Further, plaintiffs contend that they did not make any misrepresentations as to the nature and extent of the damage to their personal property. Plaintiffs contend that while they claimed $29,000 for personal property on their initial bankruptcy schedule, they subsequently amended the schedule to include their claim for all the lost and damaged personal property. Plaintiffs also contend that the statute and some of the case law cited by defendant regarding misrepresentations is not on point as they deal with misrepresentations made in the application for insurance and not in the claims process. They also contend that the remaining case law cited is distinguishable from the facts of this case and therefore not applicable. Finally, plaintiffs assert that materiality of a misrepresentation is a mixed question of law and fact that is to be determined by the trier of fact.

Upon review of the record as presented, the court concludes that defendant is not entitled to summary judgment on plaintiffs' breach of contract claim. The court cannot adequately determine from the record presented that the additional damages plaintiffs seek from defendant under the insurance policy were in fact caused by

plaintiffs' four-day delay in reporting their loss or caused by plaintiffs' use of Mr. Orr rather than one of defendant's recommended vendors to dry plaintiffs' home. The court concludes that the evidence cited by defendant, plaintiff, Norman West's testimony, Mr. S. King Ulmer's report and Mr. Eden's report, is insufficient to establish as a matter of law that plaintiffs cannot recover under the policy for additional damages. While Mr. Ulmer states in his report that delay in remediation of the interior flooring was the cause of the musty odor in plaintiffs' home, that moisture had resided in the "voids" for over two months without drying out, and that continued neglect of remediation would most likely result in an increase in the severity of the damage, he also stated that "[e]xposing, drying and treating wood that has had a prolonged exposure to moisture has long been a common method of remediation. It is curious that this universally accepted method has been resisted in this case." Exhibit 12, defendant's motion, p. 4. He also summarized that "[u]nless the components are exposed, dried and treated additional damage will occur." *Id.*

As to damages caused by mold and wet and dry rot, the court concludes that defendant is entitled to summary judgment as to any claim for breach of contract seeking such damages. Plaintiffs, as previously stated, do not dispute that the insurance policy excludes such damages. Because plaintiffs do not dispute that the insurance policy excludes such damages, the court concludes that plaintiffs cannot recover any such damages, to the extent such damages are sought, based upon a breach of contract theory.

As to the Redox machine, the court concludes that based upon plaintiff, Norman West's testimony, that genuine issues of fact exist as to whether the machine was used for business as defined by the insurance policy. The court therefore concludes that defendant is not entitled to summary judgment on the breach of contract claim as to the Redox machine.

The court concludes that defendant is not entitled to summary judgment on the basis that the insurance policy is void due to alleged misrepresentations made by plaintiffs.  The court concludes that the evidence in the record raises genuine issues of fact as to whether alleged misrepresentations were made and whether the misrepresentations, if made, were made intentionally.

Bad Faith Claim

Defendant also contends that summary judgment is appropriate on plaintiff's bad faith claim because the evidence shows that there was a legitimate dispute between the parties as to the cause and scope of plaintiffs' loss.  Defendant contends that in establishing the amounts payable for necessary repairs to plaintiffs' home, it relied on relevant experts in construction, heat and air, home security and electronics. Defendant contends that it was entitled to rely on the opinions of its experts in evaluating plaintiffs' claim, and in doing so, it did not act in bad faith.

Defendant contends that it is entitled to judgment on plaintiffs' bad faith claim as to any damages for mold or wet rot because plaintiffs' claim for such damages is excluded by the policy and defendant was entitled to deny coverage for those damages.

Defendant further contends that plaintiffs' bad faith claim as to replacement of the Redox machine fails because it properly applied the business property exception. At the very least, defendant contends that there was a legitimate dispute as to the available coverage for the Redox machine.

Plaintiffs contend that defendant acted unreasonably in investigating their loss and in underscoping their damages.  Plaintiffs contend that defendant did not hire any experts to help in its investigation and has not produced any expert reports in this action.

Plaintiffs additionally contend that defendant acted unreasonably in concluding that the redox machine was used by plaintiff, Norman West, in conducting a business rather than for a hobby.

Further, plaintiffs contend that defendant acted unreasonably in withholding additional living expense payments despite its awareness of Norman West's medical condition.

Under Oklahoma law, an insurance company has an implied duty to deal fairly and act in good faith with its insured. Sims v. Great American Life Ins. Co., 469 F.3d 870, 891 (10th Cir. 2006); Christian v. American Home Assurance Co., 577 P.2d 899, 904 (Okla.1977). If the insurance company fails to fulfill this duty, a bad faith action in tort can arise. *Id*. The essence of the bad faith tort is the unreasonableness of the insurer's actions. Timberlake Constr. Co. v. U.S. Fidelity & Guar. Co., 71 F.3d 335, 343 (10th Cir.1995) (citing Conti v. Republic Underwriters Ins. Co., 782 P.2d 1357, 1360 (Okla.1989)). Bad faith conduct includes "the unjustified withholding of payment due under a policy." McCorkle v. Great Atlantic Ins. Co., 637 P.2d 583, 587 (Okla.1981). An insurer does not breach the duty of good faith by litigating a dispute with its insured, however, if there is a "legitimate dispute" as to coverage or the amount of the claim, and the insurer's position is reasonable and legitimate. Timberlake, 71 F.3d at 343. Nevertheless, by presenting evidence casting doubt on the legitimacy of an insurer's good faith justification for disputing a claim, a plaintiff can defeat summary judgment and present his case to the jury. *See*, McCoy v. Oklahoma Farm Bur. Mut. Ins. Co., 841 P.2d 568 (Okla.1992). Even a "legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith" where the insured presents sufficient evidence reasonably tending to show bad faith or unreasonable conduct. *See*, Timberlake, 71 F.3d at 343 (citing Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1440 (10th Cir.1993)); *see also*, Sims, 469

F.3d at 891 ("The simple presence of a legitimate dispute does not necessarily end the inquiry. Instead, it shifts the burden to the insured to present additional evidence of bad faith.")

Initially, the court finds that defendant is entitled to summary judgment on plaintiffs' bad faith claim as to defendant's application of the business property limitation of $2,500 to the Redox machine. The court has previously concluded that a genuine issue of material fact exists as to whether plaintiff, Norman's West use of the Redox machine falls within the definition of "business" which includes "any full-time or part-time trade, profession, occupation engaged in for economic gain." Exhibit 2, defendant's motion, p. 1 of policy. The court concludes that no reasonable juror could conclude that defendant's application of the business property limitation to the redox machine was unreasonable within the meaning of Oklahoma law relating to bad faith claims against insurers.

The court concludes that there are genuine issues of material fact as to plaintiffs' bad faith claim in regard to their allegations of defendant's unreasonable investigation, evaluation and untimely payment of plaintiffs' water damage claim and unreasonable withholding of additional living expenses. The court concludes that plaintiffs' bad faith claim, except for allegations relating to the redox machine, must proceed to trial (although it may be worth noting that plaintiffs seem to have given the defendant quite a bit to talk about at trial).

The court, at this time, reserves ruling on whether plaintiffs can recover damages for mold or wet rot, if the jury were to return a verdict in their favor on their bad faith claim based upon the allegations of defendant's unreasonable investigation, evaluation and untimely payment of plaintiffs' water damage claim. Plaintiffs will be required to submit authority to the court which permits such recovery of damages, prior to any submission of such damages to the jury.

Punitive Damages

Defendant seeks summary judgment on plaintiffs' request for punitive damages. The court is permitting the bad faith claim, to the extent stated, to proceed to trial. The court declines to dismiss the request for punitive damages at this time. The court concludes that the matter would be better addressed on a motion pursuant to Rule 50(b), Fed. R. Civ. P., after the court has heard plaintiffs' evidence.

Conclusion

Based upon the foregoing, Defendant Foremost Insurance Company's Motion for Summary Judgment, filed September 18, 2007 (doc. no. 47), is **GRANTED in part** and **DENIED in part**.

DATED this 20th day of December, 2007.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

06-0926p018(pub).wpd